UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TANGANEKA L. PHILLIPS,

                Plaintiff,                        Case Number 15-10525
                                                    Honorable David M. Lawson

v.

UAW INTERNATIONAL, BRIAN JOHNSON,
an individual, DAVE KEGALS, an individual,

                Defendants.

_____/

**<u>OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT</u>**

Plaintiff Tanganeka "Tina" Phillips, while employed as a casino worker by MGM Grand Detroit Casino ("MGM"), became involved in union activity with her local affiliate of the United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"), which represented casino workers at MGM. She performed paid work for the local, Local 7777 (while employed by MGM), but was never formally employed by the International Union. Nonetheless, she has brought claims in the present case against the UAW and two of its officials for race discrimination based on a hostile work environment theory under Title VII of the Civil Rights Act of 1964 and the corresponding Michigan statute. The defendants have moved for summary judgment, arguing that a union cannot be held liable for a hostile-work-environment claim as a matter of law; the International Union was not the plaintiff's employer, so her claim under Title VII must fail; and even if the plaintiff could bring such a claim, the conduct of the defendants was not sufficiently severe or pervasive to create a hostile work environment. The defendants also argue that the claims against the individual defendants, Brian Johnson and David Kagels, cannot survive

because Title VII does not authorize a claim against the employer's agents.  The Court heard the parties' arguments in open court on February 22, 2016.

The defendants' arguments that no hostile environment claims could be brought against a labor union, or that the facts presented would not support such a claim, miss the mark.  The pivotal question here is whether the plaintiff has offered facts to show that she can be considered an employee of the International Union under the applicable common law master-servant tests and within the meaning of Title VII.  The Court concludes that she has come up short on that showing, and therefore the Court will grant the defendants' motion and dismiss the case.

## I.  Facts

### A.  Background

Phillips, an African-American woman, was employed by MGM as a cage cashier and later as an intermediate banker.  She worked for MGM from June 28, 1999 until she resigned her employment on September 11, 2015, as a result of a settlement agreement with MGM in this case. In 2002 she became chairperson of a bargaining unit represented by Local 7777, an affiliate of defendant UAW.  Defendant UAW organized the MGM casino employees in 2000, forming Local 7777 in 2001.  Local 7777 represents approximately 900 MGM bargaining unit employees working at table games, slot machines, cash registers, and VIP rooms.  Defendants David Kagels and Brian Johnson are servicing representatives of the UAW who were assigned to provide service and assistance to various local unions, including Local 7777.

The UAW and Local 7777 are members of the Detroit Casino Council ("DCC"), a consortium of four unions representing different sectors of the workforce at the three casinos in Detroit.  The DCC, in turn, is a party to a series of collective bargaining agreements with each of

-2-

the Detroit casinos.  As an MGM employee, Phillips was covered by the CBA between the DCC and MGM.

Phillips became a member of Local 7777 in 2001.  She was elected as the bargaining member at large in 2002, and six months later she was appointed, and later elected, as the Local 7777 casino chairperson.  Phillips remained the elected casino chairperson until she resigned from MGM in September 2015.  The casino chairperson handles employee grievances, resolves disputes between members and MGM, ensures that MGM complies with the CBA, and participates in negotiations.

### B.  Relationship Between Local and International Unions

The UAW, as well as all local unions affiliated with the UAW, are governed by the UAW Constitution.  The UAW Constitution describes the relationship between the UAW and local unions, identifying the latter as autonomous entities that are separate from the International Union.  Local unions have their own elected officers, authority, and responsibilities.

In addition to an executive board, the UAW is also staffed by international representatives, referred to within the UAW as "servicing representatives."  Servicing representatives are assigned to work with local unions, providing assistance or "service" to them as needed or requested by the local unions.  Under the UAW Constitution, servicing representatives do not oversee the affairs of local unions, nor do they review the activities of local union officials.  The servicing representatives have no authority to direct a local union on matters of staffing, hours, or pay for local union officers or representatives.   Nor do they have the authority to supervise local union officers or representatives in the conduct of their duties, or to appoint or remove them from office.

Defendant Brian Johnson has been a servicing representative since February of 2000.  In May 2012, he was assigned to represent employees in the gaming industry in Detroit.  In 2010,

-3-

defendant David Kagels was an administrative assistant to UAW Vice President Joe Ashton, and in 2014 he was appointed as the Director of the Gaming Department. One of his responsibilities in that position was to negotiate CBAs on behalf of the UAW with casinos throughout the country, including the Detroit casinos. In 2011, the DCC began negotiations with MGM for a new CBA. Kagels was the lead negotiator on behalf of the UAW. In 2012, Kagels also served as the UAW's lead negotiator during the MGM VIP department's negotiations with MGM over terms and conditions covering VIP service employees.

Unless a local union has been placed under an administratorship, which is a rare event, the International Union does not control or supervise the affairs of local unions. An administratorship is permitted "where necessary to: (a) prevent or correct corruption or financial malpractice; (b) assure the performance of collective bargaining agreements or other duties as a bargaining representative; (c) restore democratic procedures within any chartered subordinate body; or, (d) otherwise assure carrying out the legitimate objective of this International Union by such subordinate body." UAW Const. art. 12, § 3. On September 24, 2015, about two weeks after Philips resigned from MGM, the UAW Executive Board held a hearing to consider placing Local 7777 under an administratorship for failure to comply with an executive board decision regarding Local 7777's 2013 triennial election. Subsequently, Local 7777 was placed under an administratorship.

The hierarchy of Local 7777 is not clear from the record, but it appears to consist of the following individuals during the relevant time: President Venus Jeter; Vice President Shimeca McClendon-Jackson; MGM Casino Chairperson Phillips; MGM Bargaining Member at Large Dewight (Dwight) Braxton; and a number of MGM shop stewards. When union members perform union business, Local 7777 paid "lost time" to its officers and representatives to reimburse them for

pay they would have received from their casino employer had they not been performing union business. Additionally, union members could be engaged to work as temporary organizers by the UAW, as the plaintiff was between 2006 and 2013. It appears that when union members are organizing on behalf of the UAW, they receive compensation from their local unions, rather than from the UAW directly.

### C. The Plaintiff's Relationship with the Local and International Unions

The plaintiff's most frequent duty as casino chairperson was to handle grievances. Under the CBA, the grievance procedure involved a four-step process. Step one was handled by a shop steward, step two by the bargaining member at large, and step three by the casino chairperson. Local 7777 had a further practice of referring all unresolved grievances to a UAW servicing representative, such as Brian Johnson, for a "step 3.5" meeting. The servicing representative may then decide whether to settle the grievance, withdraw it, or advance it to the final step, which was binding arbitration.

The plaintiff alleges that Johnson met with Local 7777 president Jeter, insisting that her hours, as well as others, needed to be reduced. Before that meeting, the plaintiff spent two days each week working on grievances for Local 7777, but as needed would work more. The plaintiff was paid hourly for this work by Local 7777. After Johnson's meeting with the Local 7777 president, the plaintiff was restricted to two days each week to complete union business. If more work was required, it was done on her own time, and for no pay. Before those changes, the plaintiff routinely was allowed to work more days as necessary without issue. The plaintiff concedes that she has since learned that the president of Local 7777 had the authority to reduce hours, but at the time, the UAW had the plaintiff believing it was the decision of its own representatives.

According to Ms. Jeter, elected officials, like the chairperson, take orders from the UAW with respect to how to do their job, when to do their job, and what job to do. She averred that the UAW has the final say and authority on which grievances to take and how to process them. If the UAW representative did not like the work an elected member did reviewing a grievance, the servicing representative had the authority to make elected officials do it again. According to Jeter, the UAW, despite being a separate legal entity, had the right to control every aspect of how the local union operated, including whom to hire, whom to fire, the hours local representatives would work, which grievances were to be pursued, who was paid, and how much. The UAW Constitution, however, does not support that position.

The plaintiff also participated in organizing campaigns on behalf of the UAW. She took a leave of absence from MGM between 2008 and 2013 to perform those organizing tasks. Her paychecks, however, were always issued by Local 7777. The UAW never provided her with a W-2 or a 1099 tax form. According to Kagels, after the plaintiff's performance at the VIP negotiations (discussed below), he did not feel that her participation on future organizing campaigns was in the best interest of the UAW. He prevented her from working on future UAW organizing campaigns, although he maintains it was not because of her race or in retaliation of the charges against him.

### D. The Alleged Discriminatory Conduct

#### 1. The VIP Negotiations

In 2012, Kagels served as the UAW's lead negotiator during the VIP department's negotiations with MGM over terms and conditions covering VIP service employees. The negotiating team included the plaintiff, Brian Johnson, Dewight Braxton, and a number of VIP employees. The parties reached a temporary agreement on March 2013, but, according to Kagels,

the plaintiff attempted to undermine the negotiations after she changed her mind on a certain contract term.  Kagels stated that he did not feel that her participation on future campaigns was in the best interest of the UAW.

The plaintiff alleges that during those negotiations, Kagels said he would like to fire a number of named people, all of whom were African-American.  He also allegedly said that several UAW representatives, all of whom were not African-American, hated the plaintiff and Local 7777 members.  At one of the meetings, the UAW representatives, the plaintiff, Johnson, Kagels, and representative Keith Neargardner allegedly pulled the plaintiff out of the meeting and began arguing about Braxton, who apparently had filed a charge against Johnson.  Johnson was upset because he viewed the charge as threatening his job.  Johnson allegedly said that the UAW needed to put a "Black" on staff to calm things down and asked if the plaintiff was interested.  The plaintiff did not identify any other statements by Kagels that were racially provocative or discriminatory.

2. The April 3.5 Meeting

In April 2013, Brian Johnson requested a meeting with the plaintiff to discuss grievances before 3.5 meetings with MGM employees.  The plaintiff characterized the meeting as unusual because she rarely met with Johnson before 3.5 meetings.  The plaintiff says that she asked Braxton to attend because she did not feel comfortable meeting with Johnson alone.  At the meeting, Johnson allegedly pulled out a stack of grievances, sat them on the desk, picked up the first grievance, and without inquiring about the nature of the grievance, asked the plaintiff the race of the grievant.  The plaintiff asked "what does that got to do with the grievance?"  Johnson responded, "Would you just answer the damn question?"  The plaintiff said the grievant was "Black."  Johnson flipped the file over and asked the plaintiff the race of the next grievant.  Again, the plaintiff questioned what race

-7-

had to do with the grievance, to which Johnson said, "Would you just answer the fucking question, Tina?"  The plaintiff refused to disclose the race of any more of the grievants.

Johnson turned to Braxton and asked him to provide the race of each of the grievants, which he did.  Once Johnson knew the race of a grievant, he separated the files into two piles.   The only questions Johnson asked at this meeting were the race of the grievants.   When Johnson finished separating the grievances into two piles, he rubber banded them and said he would meet the plaintiff and Braxton in the casino.  The plaintiff alleges that at a later meeting (which then plaintiff did not attend), Johnson instructed Tara McIntosh (Director of Human Resources at MGM), to send one of the two piles to arbitration and to withdraw all of the grievances in the other pile.  The record does not substantiate that allegation, however.  McIntosh averred that Johnson never asked her to withdraw a pile of grievances, nor had Johnson, to her knowledge, ever represented a grievance in a racially discriminatory manner.  Moreover, the defendants offered evidence that of the twelve grievances discussed at the meeting, only two were withdrawn: one on behalf of one Caucasian employee and one African-American employee; and excepting a grievance that was settled, Johnson appealed to mediation or arbitration on all of the other grievances involving an employee suspension or termination — including the grievance filed on behalf of an African-American employee.

After the meeting, the plaintiff sent letters to Local 7777 president Venus Jeter explaining what happened at the 3.5 meeting and asking that Johnson be removed.  Another meeting occurred at some time in 2013 where Johnson's alleged racial discrimination could be addressed.  The plaintiff says that she did not discuss the alleged discrimination with Johnson directly because she said he was too violent.  The plaintiff contends that Johnson would "bam tables," curse at her, and once threw a grievance file at her.  The plaintiff alleges that in a March 2013 meeting, Johnson

-8-

reacted angrily after someone filed charges against him by throwing the folder at the plaintiff saying, "What the fuck you giving this to me, give it to her ass."

3. The November 2013 Meeting

In a November 2013 meeting between the plaintiff and Johnson, which included Local vice-president Shimeca McClendon-Jackson, Johnson allegedly said, "I'm sick of these fucking grievances," and "I'm tired of these fucking dealers. They don't want to come to work, they're fucking lazy." The plaintiff alleges that the meeting concluded with Johnson being physically removed from her office by Keith Neargardner. Neargardner denies physically removing Johnson from the plaintiff's office. According to Jackson, since 2012 she has observed Johnson "scream[ing] and yell[ing] at African Americans[,] calling [them] incompetent and being overly critical of [their] work due to [their] race." She asserts that during the same time period, Johnson treated non-African-American union members differently, in a reserved and respectful tone.

The plaintiff and Jackson also recount Johnson declaring that "the problem with this Local is that there's too many black people." He also allegedly said that "there needs to be more Whites on the executive board."

### E.  Reporting the Conduct

The plaintiff alleges that she and others complained about Johnson at some time in 2000 and that they "got rid of him back then 'cause he's a racist." The plaintiff contends that Johnson's return was disturbing to many of the Local 7777 members, and many of them came to her to express their concerns.

The plaintiff never confronted Johnson directly with her concerns of racial discrimination. After she relayed her complaint about the 3.5 meeting to Local 7777 president Jeter, Jeter wrote a

memorandum to UAW President Bob King, signed by the plaintiff and other local executive board members, complaining about the disrespectful behavior Local 7777 was enduring from the UAW representatives.  Although the plaintiff urged Jeter to include in the memorandum the episode of racial discrimination by Johnson, no such allegations exist in the letter.

On January 17, 2014, however, in a letter to Charles Hall, the UAW Director of Region 1, Jeter described specific conduct by Johnson that she felt was disrespectful and unethical.  Jeter wrote that Johnson asked the race of "several grievants," but she did not allege that he separated and withdrew grievances on the basis of race.  On February 11, 2014, the plaintiff sent a letter to Charles Hall stating that Johnson had made inappropriate remarks toward her and Braxton "using the color of [their] skin," and stated that Johnson "request[ed] member's race when going through grievances."  Also in the letter, the plaintiff expressed her "shock to hear [Hall] say that [Johnson's] asking a member's race and separating grievances based on that was common practice."  According to the plaintiff's letter, Johnson was not going to be removed as servicing representative because of staffing issues.

On February 25, 2014, the plaintiff sent an email to Hall further expressing her frustration at Johnson's behavior and "uncontrollable rage."  She further complained that even after a meeting with Hall ten months earlier, Johnson's aggressive behavior had not improved.  And despite the plaintiff's requests for Johnson's removal, he remained.

On March 19, 2014, the plaintiff and Ms. Jackson filed EEOC charges against the UAW, alleging that Johnson had separated grievances based on race and made a racial comment.

In early 2015, Johnson and the plaintiff exchanged letters accusing each other of being unprofessional.  The plaintiff objected to Johnson coming to the local union on January 15, 2015 and

-10-

forcing open the locked door to her office and bursting in.  She continued to object to Johnson treating the grievances of minority workers less favorably than those of other workers.

F. Procedural History

On March 19, 2014, the plaintiff filed an EEOC complaint against the UAW for racial discrimination.  She received a Right to Sue letter on January 22, 2015.  The plaintiff also filed a complaint with the NLRB claiming that the UAW breached its duty of fair representation by racially discriminating against members of Local 7777.  The plaintiff commenced the present action in the Wayne County, Michigan circuit court on January 15, 2015.  The defendant timely removed the case based on federal question jurisdiction.  Thereafter, the plaintiff filed an amended complaint alleging racial discrimination in violation of Title VII of the Civil Rights Act of 1964 against MGM (Count I); racial discrimination in violation of Title VII against the UAW (Count II); and racial harassment in violation of the Michigan Elliott-Larson Civil Rights Act, Michigan Compiled Laws § 37.2201, *et seq* (Count III) against the UAW, David Kegals, and Brian Johnson.  The amended complaint included claims against MGM, and its Vice President of Human Resources, Rozell Blanks.  The Court dismissed defendants MGM and Rozell Blanks on October 1, 2015 on the stipulation of the parties.

Dwight Braxton and Shimeca McClendon-Jackson also filed lawsuits against the defendants in this case based on similar theories.  The cases are pending in this district before other judges, although Judge George Steeh granted summary judgment to the defendants in Braxton's case on January 4, 2016.  The defendants similarly move for summary judgment against all the plaintiff's claims here.

-11-

## II.  Discussion

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When reviewing the motion record, "[t]he court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).

"The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." *Id.* at 558. (citing *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)).  "Once that occurs, the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Ibid.*  (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).

"[T]he party opposing the summary judgment motion must do more than simply show that there is some 'metaphysical doubt as to the material facts.'" *Highland Capital, Inc. v. Franklin Nat'l Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) (internal quotation marks omitted).  A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*,

-12-

477 U.S. at 252.  If the non-moving party, after sufficient opportunity for discovery, is unable to meet her burden of proof, summary judgment is clearly proper.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Irrelevant or unnecessary factual disputes do not create genuine issues of material fact.  *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000).  A fact is "material" if its resolution affects the outcome of the lawsuit.  *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001).  "Materiality" is determined by the substantive law claim.  *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000).  An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party."  *Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting 477 U.S. at 248).

## A.  Disparate Treatment Claims

The plaintiff appears to have raised claims for disparate treatment and retaliation under Title VII and Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), which the defendants challenge in their motion for summary judgment.  However, the plaintiff has offered no argument in defense of either claim.  A plaintiff abandons undefended claims.  *Doe v. Bredesen*, 507 F.3d 998, 1007-08 (6th Cir. 2007) (affirming the district court's conclusion that the plaintiff abandoned certain claims by failing to raise them in his brief opposing the government's motion to dismiss); *Meredith v. Allen Cty. War Memorial Hosp. Comm'n*, 397 F.2d 33, 34 n.2 (6th Cir. 1968) ("Plaintiff also alleged in his complaint that jurisdiction existed under the antitrust laws, but this allegation was not advanced either in opposition [to] defendants' motion to dismiss or on appeal, and we therefore assume that the claim of antitrust violation has been abandoned."); *Mekani v. Homecomings Fin., LLC,* 752 F. Supp. 2d 785, 797 (E.D. Mich. 2010) (stating that where a plaintiff fails to respond to an argument

-13-

in a motion to dismiss, "the Court assumes he concedes this point and abandons the claim").
Therefore, the Court will dismiss those parts of Counts II and III of the amended complaint based
on disparate treatment and retaliation theories under Title VII and ELCRA, respectively.

### B. Hostile Work Environment

The defendants argue that the plaintiff has not offered sufficient evidence to establish the
elements of a hostile work environment claim. There is no question that Title VII "offers employees
protection from a 'workplace[] permeated with discriminatory intimidation, ridicule, and insult that
is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an
abusive working environment. . . .'" *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 514 (6th Cir. 2009)
(quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)) (alteration in original).

A plaintiff alleging that she was subjected to a hostile work environment based on race in
violation of Title VII must offer evidence showing that "(1) [s]he belongs to a protected group; (2)
[s]he was subject to unwelcome harassment; (3) the harassment was based on race; (4) the
harassment affected a term, condition, or privilege of employment and (5) defendant knew or should
have known about the harassment and failed to take action." *Moore v. KUKA Welding Sys. & Robot
Corp.*, 171 F.3d 1073, 1078-79 (6th Cir. 1999). Under Michigan's ELCRA, the elements are
substantially the same. *See Quinto v. Cross & Peters Co.*, 451 Mich. 358, 368-69, 547 N.W.2d 314,
319-20 (1996). To be actionable, the harassment must be severe or pervasive in two aspects. "Both
an objective and subjective test must be met; in other words, the conduct must be so severe or
pervasive as to constitute a hostile or abusive working environment both to the reasonable person
and the actual victim." *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006).
These tests are intended to distinguish between "simple teasing, offhand comments, and isolated

-14-

incidents," which are not actionable, *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998), and a "workplace [that] is permeated with 'discriminatory intimidation, ridicule, and insult,'" which is actionable, *Harris*, 510 U.S. at 21.

The plaintiff points to evidence of at least three incidents over the years, which she says characterize the employment environment in the union workplace. First, the 2012 VIP negotiations where Johnson said we need to put a "Black" on staff to calm things down and asked the plaintiff if she wanted the job. Second, the April 2013 meeting where Johnson called a meeting with the plaintiff and methodically separated union grievants' files by race. The plaintiff testified in her deposition that she asked Braxton to attend because she did not feel safe to be alone with Johnson. Third, the November 2013 meeting where Johnson had to be physically removed from the plaintiff's office. The record includes statements by members of the executive board recounting Johnson exclaiming "the problem with this Local is that there's too many black people." And Ms. Jackson stated that she had witnessed Johnson screaming and yelling at African-American union members, but communicating with non-African-American union members in a reserved and respectful tone. The Local 7777 executive board wrote multiple letters to the UAW complaining about the treatment they were enduring.

The defendants' argument is essentially that the events did not happen or that these were mere offensive utterances. The defendants also filed a notice of supplemental authority to inform the Court that another judge in this district granted their motion for summary judgment in Braxton's case against these same defendants. The court there found that the UAW was not the plaintiff's employer, and that the environment created by defendant was not severe or pervasive. *Braxton v. UAW Int'l*, 2016 WL 28825 (E.D. Mich. Jan. 4, 2016). However, when determining hostility,

context matters. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81-82 (1998) ("The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing or roughhousing among members of the same sex, and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive."). Consequently, "where individual instances of [racial] harassment do not on their own create a hostile environment, the accumulated effect of such incidents may result in a Title VII violation." *Williams*, 187 F.3d at 563. And, as the Sixth Circuit has recently reminded us, "whether harassment was so severe and pervasive as to constitute a hostile work environment [is] 'quintessentially a question of fact.'" *Smith v. Rock-Tenn Servs., Inc.*, --- F.3d ---, 2016 WL 520073, at *8 (6th Cir. Feb. 10, 2016) (quoting *Jordan v. City of Cleveland*, 464 F.3d 584, 597 (6th Cir. 2006)).

The plaintiff describes events, when considered as a whole, that would permit a jury to conclude that the defendants created a hostile work environment based on race. Whether the alleged conduct was harassment so severe or pervasive as to constitute a hostile work environment is "quintessentially a question of fact," which a jury should decide. *Smith*, 2016 WL 520073, at *8.

C. Labor Union's Liability for Hostile Work Environment Claim

The plaintiff argues that under Title VII, a labor union in its representational role can be liable to a union member for creating a hostile work environment. The Sixth Circuit has not addressed that issue, but there is persuasive authority suggesting otherwise, and good reason to conclude that the plaintiff's argument is not supported by the statutory text.

-16-

Title VII generally prohibits "an *employer* [from] "discriminat[ing] against any individual with respect to [her] compensation, terms, conditions, or privileges or employment, because of such individual's . . . race." 42 U.S.C. § 2000e–2(a)(1) (emphasis added). The statute also prevents "a labor organization [from] exclud[ing] or . . . expel[ling] from its membership, or otherwise . . . discriminat[ing] against, any individual because of [her] race." 42 U.S.C. § 2000e–2(c)(1). The plaintiff has conflated these two sections, suggesting that a labor union's liability under section (c) can be based on a hostile work environment theory of discrimination. However, "[t]he hostile work environment theory grows out of 42 U.S.C. § 2000e–2(a)(1)'s language." *Kasper v. City of Middletown*, 352 F. Supp. 2d 216, 233-34 (D. Conn. 2005) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002)); *see also Hout v. City of Mansfield*, 550 F. Supp. 2d 701, 742 (N.D. Ohio 2008).

The plaintiff cites *Dowd v. United Steelworkers of Am., Local No. 286*, 253 F.3d 1093 (8th Cir. 2001), in support of her position. Indeed, in that case, the Eighth Circuit determined that the phrase "or otherwise to discriminate against" in section 2000e–2(c) could authorize a claim for a hostile work environment against a union. *Id.* at 1102. But the origin of the hostile environment theory as found in the text of Title VII does not lead to that conclusion.

In *Dowd*, the plaintiffs crossed a union picket line at a Goodyear tire plant and were subjected to severe racial slurs by union members in the presence of shop stewards. 253 F.3d at 1096-97. Even after the three-week strike ended, the hostile conduct and racial slurs persisted, even including hostile comments made over the employer's intercom system. *Id.* at 1097. Some union members began wearing tee shirts with one of the plaintiff's names in the sights of a gun, and others wore shirts with the plaintiff's name combined with racial slurs. *Ibid.* The *Dowd* court stated that

-17-

"[t]he touchstone for a Title VII hostile environment claim is whether '*the workplace* is permeated with' discriminatory intimidation, ridicule and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Dowd*, 253 F.3d at 1101-02 (emphasis added) (quoting *Quick v. Donaldson Co.*, 90 F.3d 1372, 1378 (8th Cir. 1996) (quoting *Harris*, 510 U.S. at 21)). The court found that "a reasonable juror [could] conclude that the union authorized or encouraged the unlawful harassment." *Id.* at 1103.

By anchoring its holding that a hostile environment claim emerges from the "otherwise . . . discriminate" language in section (c), the court ignored the actual textual origin of that theory. The hostile environment theory is based not merely on the prohibition against discrimination, but on discrimination "with respect to . . . compensation, terms, conditions, or privileges of employment," a phrase that is found the section (a), which regulates the conduct of employers, and not in section (c), which applies to labor unions. The Supreme Court has explained how that complete phrase undergirds the hostile environment theory, most recently in *Vance v. Ball State University*, --- U.S. ---, 133 S. Ct. 2434 (2013):

> Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). This provision obviously prohibits discrimination with respect to employment decisions that have direct economic consequences, such as termination, demotion, and pay cuts. But not long after Title VII was enacted, the lower courts held that Title VII also reaches the creation or perpetuation of a discriminatory work environment.
>
> In the leading case of *Rogers v. EEOC*, 454 F.2d 234 (1971), the Fifth Circuit recognized a cause of action based on this theory. *See Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65-66 (1986) (describing development of hostile environment claims based on race). The *Rogers* court reasoned that "the phrase 'terms, conditions, or privileges of employment' in [Title VII] is an expansive concept which sweeps within its protective ambit the practice of creating a working environment

-18-

> heavily charged with ethnic or racial discrimination." 454 F.2d at 238.  The court
> observed that "[o]ne can readily envision working environments so heavily polluted
> with discrimination as to destroy completely the emotional and psychological
> stability of minority group workers."  *Ibid.*
> . . .
> When the issue eventually reached this Court, we agreed that Title VII prohibits the
> creation of a hostile work environment.  *See Meritor*, *supra*, at 64-67.  In such cases,
> we have held, the plaintiff must show that the work environment was so pervaded by
> discrimination that the terms and conditions of employment were altered.  *See, e.g.,
> Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993).

*Vance*, 133 S. Ct. at 2440-41.

Certainly, labor unions can be liable under Title VII for discriminating on the basis of race against individuals seeking union membership or participating in union activities, or classifying members by race, or referring members for work opportunities on the basis of race, or causing an employer to discriminate against an individual on the basis of race.  42 U.S.C. § 2000e–2(c)(1)-(3); *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 667 (1987); *Farmer v. ARA Serv., Inc.*, 660 F.2d 1096, 1104 (6th Cir. 1981); *Wrobbel v. Int'l Bhd. of Elec. Workers, Local 17*, 638 F. Supp. 2d 780, 793 (E.D. Mich. 2009) (citing *Dixon v. Int'l Brotherhood of Police Officers*, 504 F.3d 73, 84-85 (1st Cir. 2007)).  However, they may not be held accountable under 42 U.S.C. § 2000e–2(c) on a hostile work environment theory, because that section does not prohibit a labor union from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment."

That is not to say, however, that a labor union may not be liable under section (a) for creating a hostile environment as an employer.  Although the Sixth Circuit has not spoken on this question, other circuits have held unanimously that unions can be sued in their capacity as employers.  *See Ferroni v. Teamsters, Chauffeurs & Warehousemen Local No. 222*, 297 F.3d 1146, 1151 (10th Cir. 2002) (deciding that a "labor organization that is sued by an employee alleging discrimination in the

-19-

employment relationship should [not] be treated any differently than any other employer"); *Chavero v. Local 241, Div. of the Amalgamated Transit Union*, 787 F.2d 1154, 1155 (7th Cir. 1986) (holding that "[u]nder Title VII a union can be both an 'employer' and a 'labor organization'").

There is support for this proposition in the statute. Title VII contemplates the existence of an employer-employee relationship with a labor organization in its definition of "employer":

> The term 'employer' means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person, but such term does not include . . . a bona fide private membership club (*other than a labor organization*) which is exempt from taxation under section 501(c) of Title 26.

42 U.S.C. § 2000e(b) (emphasis added). "[T]he plain language of the statute shows that a labor organization can be an employer." *Ferroni*, 297 F.3d at 1151 (citing 42 U.S.C. § 2000e(b)). As such, a labor union may not discriminate against its own employees on the basis of race, either by discrete acts or by creating a hostile work environment. *See Kasper*, 352 F. Supp. 2d at 234 n.25 (observing that although the plaintiffs could not proceed against the defendant labor union under section 2000e–2(c), they could have brought a hostile-work-environment claim against the union as an employer under section 2000e–2(a), but they did not do so (citing *Yerdon v. Henry*, 91 F.3d 370, 375 (2d Cir. 1996)).

### D.  UAW's Status as Plaintiff's Employer

The UAW argues that it was never the plaintiff's employer, nor could it be. In support, the defendants cite several cases, which they contend establish the rule that as a matter of law an international union does not control affiliated local chapters, and each is a distinct entity. *E.g., Hoyle v. United Auto Workers Local Union 5285*, 444 F. Supp. 2d 467, 476 (W.D.N.C. 2006). The Court does not read those decision as the defendants do. The idea that an international union and

its locals are separate entities is hardly a novel proposition.  For instance, in *Hoyle*, the court held that the local union was not a mere agent of the international union, and therefore it could not accept service of process on its behalf.  The other cases the defendant cites merely reiterate that local and international unions are distinct legal entities, and that the international unions are not automatically liable for the actions of the local affiliates. But that does not mean that an international union could never be an employer of an individual who also works for a local affiliate.  Instead, the relationship must be examined according to the facts in each case to determine whether an employer-employee relationship exists.

Title VII defines "employer" to mean "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person." 42 U.S.C. § 2000e(a).  A labor organization is engaged in an industry affecting commerce if it has fifteen or more members and "is the certified representative of employees under the provisions of the National Labor Relations Act." 42 U.S.C.§ 2000e(e)(1).  The UAW satisfies both of these criteria, and qualifies as an "employer" under Title VII.  The question, however, is whether the plaintiff has offered sufficient facts that would allow a jury to conclude that she was the UAW's employee.

Title VII defines an employee as "an individual employed by an employer." 42 U.S.C. §2000e(f).  "The circularity of this definition renders it quite unhelpful in explaining whom Congress intended to include as an employee in the workplace." *Marie v. Am. Red Cross*, 771 F.3d 344, 352 (6th Cir. 2014) (citing *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992).  Therefore, when Congress uses the term "employee" without defining it with precision, courts

should presume "'that Congress intended to describe the conventional master-servant relationship as understood by common-law agency doctrine.'" *Id.* at 352 (quoting *Darden,* at 322-23).

> According to the Supreme Court,
>
> [i]n determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Darden*, 503 U.S. at 323-24; *see also Marie*, 771 F.3d at 352. "The crux of *Darden*'s common law agency test is 'the hiring party's right to control the manner and means by which the product is accomplished.'" *Weary v. Cochran*, 377 F.3d 522, 525 (6th Cir. 2004); *see also Marie*, 771 F.3d at 356 (6th Cir. 2014) (the Sixth Circuit has "repeatedly held that the 'employer's ability to control job performance and the employment opportunities of the aggrieved individual' are the most important of the many factors to be considered.") (quoting *Janette v. Am. Fid. Grp., Ltd.*, 298 F. App'x 467, 472 (6th Cir. 2008)). "The degree of importance of each factor will vary depending on the occupation and the factual context in which the services are performed." *Bryson v. Middlefield Volunteer Fire Dep't, Inc.*, 656 F.3d 348, 354 (6th Cir. 2011) (internal quotation marks omitted). Indeed, courts must "consider and weigh all incidents of the relationship no matter how the parties characterize the relationship." *Ibid.*

The plaintiff contends that the Sixth Circuit recognized three additional factors in *Satterfied v. Tennessee*, 295 F.3d 611, 617 (6th Cir. 2002). The plaintiff is mistaken. The *Satterfied* court merely recognized the three distinct "legal theories under which entities can be deemed employers."

-22-

*Id.* at 616–17. "These three lines of cases do not seem to recognize one another; although, arguably, the later cases in this court stating the first theory consolidate all three theories under the 'control' concept." *Ibid.* But that does not impact the analysis here.

The Court has little trouble concluding that the plaintiff was an employee of Local 7777. *See Daggitt v. United Food & Commercial Workers Int'l Union, Local 304A*, 245 F.3d 981, 987-89 (8th Cir. 2001)) (holding that union stewards were employees of a union local, where the shop stewards received monetary benefits from the local union in the form of lost-time pay, for which the stewards received a W-2 form, and the local union president had the power to replace the stewards and fill shop steward vacancies in between elections). However, that does not make her an employee of the UAW. "[A]lleged employee-employer relationships can be complex and may not fit neatly into one particular categorization." *Bryson*, 656 F.3d at 355. Applying the factors discussed in *Darden*, as interpreted by the Sixth Circuit's cases, the plaintiff cannot advance her hostile work environment claim unless she has presented evidence in the record showing that the UAW, not the local, "control[led] [her] job performance and . . . employment opportunities." *Marie*, 771 F.3d at 356.

The plaintiff has offered evidence that the International Union exerted some measure of control over how the local affiliates process grievances through step three of the process, as well as other activities of the local affiliate. Former Local 7777 president Venus Jeter stated in her affidavit that:

> 13.  Elected [local] union officials like the Chairperson and at large bargaining members take orders from the International UAW with respect of how to do the job, when to do the job, what job to do and why to do the job.

> 14.  The International UAW representatives have the final say and authority on which grievances to take and how to process them.

15.   If an International UAW representative does not like the job the bargaining member did in preparing a grievance, the UAW representative has the authority to make them do it over.

The plaintiff herself stated that "when we get a directive from International we follow it." And Jeter added that the International Union had the right to control every aspect of how the local union operated. But those averments are conclusory, and the plaintiff has not offered any hard facts to back them up. In fact, the plaintiff has offered no evidence that the UAW possessed or deployed the typical carrots (compensation, bonuses, perquisites) and sticks (discipline, terminations) generally used by employers in its relationships with Local 7777 employees, including the plaintiff.

For instance, it is undisputed that the International Union did not have the authority to hire or fire the plaintiff. She was elected to her position as chairperson of Local 7777's MGM unit, and the UAW Constitution allows only the local union to recall a bargaining representative for cause. *See* UAW Const., art. 45 § 3. An exception to that rule arises when a local is placed in administratorship, but that action did not occur in this case until after the plaintiff resigned. The International Union did not compensate the plaintiff for her work; she was paid by Local 7777. Nor did it prescribe the plaintiff's working hours or assign her work. There is evidence that when Johnson met with local president Jeter to discuss the local's budget, he told her that a number of union members' hours, including the plaintiff's, needed to be cut back. And thereafter, the plaintiff was restricted to conducting local union business to two days each week, where before she was allowed more time to process grievances if necessary. But the plaintiff concedes that Jeter had the authority to reduce her hours, although at that time she believed it was the decision the UAW representatives. And the plaintiff determined her own schedule for conducting union business, coordinating only with local union leadership.

-24-

The plaintiff conducted her union work in an office at the local union hall, using supplies and a computer furnished by the local. Her main duties were resolving disputes between the local members and MGM, and processing grievances through the first three steps of the dispute-resolution process. It is true that the International Union took over the grievance process at step four, and if the grievances were written up poorly, the UAW's servicing representative could send them back for further work. But that does not amount to the "ability to control job performance and . . . employment opportunities." *Marie*, 771 F.3d at 356. Nor does it amount to control over which grievances are accepted at the initial stages. The UAW retains control over which grievances will be taken to mediation or arbitration in step four, but that feature of the procedure does not "control" the local chairperson's discretion or job performance in the earlier steps of the process. In fact, the plaintiff acknowledged that the International Union did not direct the local or its employees on which grievances to file.

*Darden*'s common law agency test, applied to the undisputed facts disclosed by the record in this case taken in the light most favorable to the plaintiff, does not support the plaintiff's contention that she was an employee of the UAW within the meaning of Title VII. Therefore, the plaintiff may not proceed on a claim against the defendants for creating a hostile work environment under 42 U.S.C. § 2000e–2(a).

## E.  ELCRA Claim

The plaintiff has brought a hostile work environment claim under Michigan's Elliott-Larsen Civil Rights Act based on the same facts. "Claims of race discrimination brought under the ELCRA are analyzed under the same standards as claims of race discrimination brought under Title VII."

*Dotson v. Norfolk S. R.R. Co.*, 52 F. App'x 655, 657 (6th Cir. 2002) (citing *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999)).  However, Michigan courts use the economic realities test to determine if a party is an "employee" under the ELCRA.  *Ashker v. Ford Motor Co.*, 245 Mich. App. 9, 14–15, 627 N.W.2d 1 (2001).  Michigan "courts generally consider the following four factors '(1) [the] control of a worker's duties, (2) the payment of wages, (3) the right to hire and fire and the right to discipline, and (4) the performance of the duties as an integral part of the employer's business towards the accomplishment of a common goal.'"  *Clark v. United Techs. Auto., Inc.*, 459 Mich. 681, 688, 594 N.W.2d 447, 451 (1999) (quoting *Askew v. Macomber*, 398 Mich. 212, 217-218, 247 N.W.2d 288 (1976)).  For the same reasons discussed above, the plaintiff does not qualify under the ELCRA as an employee of the UAW.

### F.  Claims Against Individual Defendants

The defendants ask the Court to dismiss the Title VII claims against Kagels and Johnson because individuals are not subject to suit under Title VII.  It is well established that "an individual employee/supervisor, who does not otherwise qualify as an 'employer,' may not be held personally liable under Title VII."  *Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 405 (6th Cir. 1997).  However, Count II of the amended complaint does not name either Kagels or Johnson; the plaintiff there makes allegations of racial discrimination under Title VII against the UAW only.

The plaintiff did, however, make allegations against Kagels and Johnson under the ELCRA.  An individual may be held personally liable under the ELCRA.  *Elezovic v. Ford Motor Co.*, 472 Mich. 408, 411, 697 N.W.2d 851, 853 (2005) (citing Mich. Comp. Laws § 37.2201(a), which defines an "employer" to include "an agent of that person").  However, Kagels and Johnson were agents

-26-

only of the UAW.  Because that entity was not the plaintiff's employer, the plaintiff cannot proceed against the individuals under the ELCRA.

III.

Title VII authorizes lawsuits by individuals for damages caused by a hostile work environment only against that individual's employer.  Such claims may be brought against a labor union, but only if the union is the employer of the individual.  The plaintiff has not offered evidence in the record from which a jury could conclude that she was an employee of defendant UAW. Therefore, she may not pursue her complaint against the defendants.  The plaintiff also filed a motion to strike the defendants' late-filed witness list.  That motion has no bearing on the summary judgment motion, because it was not necessary for the Court to refer to the affidavits or testimony of any of the challenged witnesses when addressing the summary judgment motion.

Accordingly, it is **ORDERED** that the defendants' motion for summary judgment [dkt. #34] is **GRANTED**.

It is further **ORDERED** that the plaintiff's motion to strike the defendants' witnesses and summary judgment motion [dkt. #38] is **DENIED**.

It is further **ORDERED** that the amended complaint is **DISMISSED WITH PREJUDICE**.

s/David M. Lawson<br>DAVID M. LAWSON<br>United States District Judge

Dated:   February 26, 2016

-27-

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on February 26, 2016.

s/Susan Pinkowski
SUSAN PINKOWSKI